**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

GARRETT P. FIRESTONE, individually,
and on behalf of all others, similarly situated,

      Plaintiff,

v.

FANDUEL, INC. and
DRAFTKINGS, INC.,

      Defendants.

---

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

---

### INTRODUCTION

Plaintiff **GARRETT P. FIRESTONE** ("Plaintiff"), individually, and on behalf of all others similarly situated, through his attorneys, **KEVIN S. HANNON** and **GILLIAN M. FAHLSING**, of **THE HANNON LAW FIRM, L.L.C.**, brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure against FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings"), collectively "Defendants", and states as follows:

### NATURE OF THE CASE

1.    This is a class action complaint against Defendants FanDuel, Inc. and DraftKings, Inc., two companies operating daily fantasy sports ("DFS") websites marketed to residents of Colorado in a manner that violates Colorado law.

2.      On the internet websites marketed by Defendants, individuals participate with other individuals in fantasy sports games.  Defendants create contests where individuals accumulate points based on statistics of actual players' performance in professional sporting events that occur on a particular day.

3.      The start of the 2015 NFL season saw a huge media blitz as Defendants spent more than $100,000,000 on television ads and became two of the top television advertisers in the United States.  As a result of this advertising blitz, Defendants added millions of new users.

4.      Defendants have profited from and continue to profit from fees they take from each entry into their contests, and the monies made on those fees.

5.      Defendants have made and continue to make material misrepresentations and omissions on their websites and in their promotional materials that misrepresent the true nature of the contest, including that the contests are legal games of skill.  The material misrepresentations and omissions of Defendants fraudulently induced Plaintiff and other members of the class to give Defendants money, from which Defendants derived fees.

6.       Plaintiff and the members of the class deposited and risked and lost money and fees on FanDuel's and DraftKings' tournaments and contests, and without a class action in this Court would not be able to feasibly, economically or otherwise reasonably protect their rights, nor would they be able to receive compensation and penalties for Defendants' wrongful acts.

## PARTIES

7.      Plaintiff, Garrett Firestone, is a resident of Denver County, Colorado.  He brings this action on behalf of himself individually, and on behalf of a class of persons similarly situated as

described in the definition of the class identified below.  Plaintiff Firestone deposited money into a DraftKings account and a FanDuel account and competed in contests that resulted in a loss.

8.      Defendant DraftKings, Inc. is incorporated in Delaware with its principal place of business in Boston, Massachusetts.

9.      Defendant FanDuel, Inc. is  Delaware corporation with its principal place of business in New York, New York.

### JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because at least one class member is of diverse citizenship from one defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

11.      This Court has personal jurisdiction over Defendants because they conduct business in Colorado, and have sufficient minimum contacts with Colorado.

12.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Defendants have caused harm to class members residing in this District. A substantial number of the events giving rise to this Complaint occurred in Colorado.  Plaintiff and class members are all Colorado citizens who risked money with Defendants based on representations, misrepresentations and omissions made in Colorado by Defendants to residents of Colorado.

## FACTUAL BACKGROUND

### A.     Daily Fantasy Sports

13.     Daily Fantasy Sports (DFS) are contests in which participants risk money paid to Defendants for a chance for winning additional monies. Participants select a contest in which to participate at varying levels of money risked. Participants then select a "roster" from actual sports players playing on a given day and develop a "roster" within a salary limit or "cap."

14.     Defendants evaluate the performance of those players who are selected by participants in a particular contest.  Then based on actual performance over which participants have no control, Defendants assign those players points for their performance that day.  Those points get accumulated by the participants who selected those players, and the participant with the most points receives the prize money for that contest.

15.     Defendants promoted and continue to promote their contests to Plaintiff and the members of the class as contests in which their skill makes the difference between winning and losing.  For instance, Defendant FanDuel's Terms of Service claim "FanDuel is a game of skill." *See* https://www.fanduel.com/terms at ¶5.

16.     Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

### B.     Defendants' DFS Schemes Constitute Gambling in the State of Colorado

17.     Colorado law prohibits sports betting schemes, including FanDuel's and DraftKings' DFS schemes.

18.     In Colorado, gambling includes risking any money, credit, deposit, or thing of value for gain contingent in whole or in part upon lot, chance, or the happening of outcome of an event, including a sporting event, over which a person taking a risk has no control.  C.R.S. § 18-10-102(2).

19.     Defendants' DFS schemes are sports betting contests based on the performance of individual players that participate in college and professional sports over which the contest participants in the contest have no control.

20.     In Defendants' DFS schemes, contest participants have no measure of control over all the variables that affect the performance of the college and professional athletes, upon which the payout of prize money in the DFS scheme is predicated, rendering the Defendants' scheme a game of chance, and in turn, gambling under Colorado law.

21.     Defendants' actions in fact constitute professional gambling under Colorado law, defined as aiding or inducing another to engage in gambling, with the intent to derive a profit therefrom.  C.R.S. § 18-10-102(8)(a).  Professional gambling, and the transmission of gambling information, are illegal in the state of Colorado.  C.R.S. § 18-10-103, 106.

22.     Important for Defendants' employees' participation in Defendants' DFS schemes, professional gambling also includes participation in gambling, and having, either by virtue of skill or luck, a lesser chance of losing or a greater chance of winning than one or more other participants.  C.R.S. § 18-10-102(8)(b).

23.     Both Defendants' DFS schemes, and Defendants' employees' participation in the other DFS schemes, constitute professional gambling in the state of Colorado.

24.     Defendants intentionally misrepresent that their DFS gambling scheme is not illegal. Defendants do so knowing that if the DFS schemes were treated as gambling, they would either not be allowed to operate, or would operate under significant regulation of their activity, resulting in turn in a significant loss of profits.

### C.     The Value of Inside Information and Data In DFS Contests

25.      DraftKings' and FanDuel's employees have had access to certain data and information about how the DFS sites calculate their points and payout which is not publicly available.  For instance, DraftKings performs analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on FanDuel would do if they were entered into DraftKings' contests.  DraftKings knows the value of this data and knows that it should not be shared.

26.     In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

27.     Defendants also have set and continue to set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

28.     Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

6

29.     Indeed, a DraftKings' employee accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all the contestants' lineups were "locked" and could therefore still be changed.  This employee initially claimed he was "the only person with this data and as a [DraftKings'] employee, am not allowed to play on site.[1]"

30.     However, the same week that he posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[2]  An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to DraftKings working for a DFS company.

31.     DraftKings and FanDuel, in concert, said that this employee beating 229,883 people the same week he had access to ownership data was a "coincidence."[3]

32.     The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using non-public information, data and insider strategic information.

_____

[1] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 7, 2015)

[2] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015)

[3] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (accessed Oct. 7, 2015)

33.     In all DraftKings' employees have won at least $6,000,000 playing at FanDuel, which is more than one million dollars per year, considering DraftKings is only a few years old.[4] DraftKings was well aware of its employees playing on FanDuel, and aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[5]  FanDuel was well aware of its employees playing at DraftKings, and aware that some of its employees made more money from winning on DraftKings than their actual salaries.

34.     For both Defendants, numerous employees have had access to data that could give players an advantage.

35.     According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees - often executives - of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[6] FanDuel's CEO admitted to personally playing on competitor sites.[7]

36.     Plaintiff and class members acted in reliance on Defendants' misrepresentations that the chances of winning were based on "skill" rather than based on inside information.

---

[4] http:www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (accessed Oct. 7, 2015)

[5] https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (Oct. 7, 2015)

[6] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 7, 2015)

[7] https://rotograinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (Oct. 7, 2015)

37.     Had Plaintiff and the members of the class known that Defendants allowed employees of DFS sites to play against them, Plaintiff and members of the class would not have played on Defendants' websites.

38.     Plaintiff and class members deposited money in FanDuel's and in DraftKings' accounts before the disclosure of the fact that FanDuel's employees were playing with inside information.

39.     After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statement on their websites, continuing to act in concert.

40.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their sites.

41.     Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on their own DFS sites and to prevent DFS employees from other DFS operators playing on their sites.

**D.      Invalidity of Arbitration and Class Action Waiver Provisions of Terms of Use**

42.     DraftKings' and FanDuel's Terms of Use do not constitute a valid, enforceable contract.

43.     First, DFS sports constitute illegal gambling in the state of Colorado pursuant to C.R.S. § 18-10-102.  Thus, Defendants' contracts with Plaintiff and class members have been and

are illegal, unenforceable and against public policy.  Defendants' Arbitration and Class Action Waiver terms are both substantially and procedurally unconscionable and void as against public policy because they seek to limit legal rights and remedies for conduct illegal in Colorado.

44.     Plaintiff and the members of the class were fraudulently induced into risking money on DraftKings' and FanDuel's contests because they were represented to be a fair game of skill.  In addition, Defendants' DFS was supposed to be without the potential for insiders to use non-public information to compete against them.

45.     The so-called "Terms of Use" issued by Defendants do not constitute valid, mutual agreements also because the promises made by DraftKings and FanDuel are illusory.  Indeed, there is no restriction on DraftKings' or FanDuel's ability to terminate the "agreement" or to refuse to perform.  For example, the so-called "Terms of Use" provide that DraftKings and FanDuel and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever."  *See e.g.*, https://www.fanduel.com/terms at ¶ 7.

46.     The so-called "Terms of Use" are an illusory contract because they purport to reserve to Defendants the right to deny service to any user for any reason "whatsoever."

47.     Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give Defendants the right, "without prior notice," to "revoke any and all of your rights granted hereunder."  Thus, once again, DraftKings and FanDuel are not bound to any performance obligation.

48.     The Terms of Use purport to require arbitration, but give Defendants the exclusive right to revoke the arbitration provision because, for example, they state that any claim or dispute

that arises in whole or in part from the Terms of Use shall be decided exclusively by a court of competent jurisdiction located in Suffolk, Massachusetts.

49.     In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through a separate transaction.

50.     The Terms of Use are procedurally and substantively unconscionable and against public policy. As a result, the Terms of Use requiring arbitration, preventing filing claims as a class action, limitations of warranties, and all other provisions of Defendants' Terms of Use are invalid and unenforceable.

## ANY OTHERWISE-APPLICABLE STATUTES OF LIMITATION ARE TOLLED

51.     Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiff and members of the class could not have discovered that Defendants were concealing and misrepresenting the true facts about their websites, the legality of their contests, chance as the determinant of the outcome of success, and other information including inside information.

52.     Defendants had information in their sole possession about the existence of these facts, which was discovered by Plaintiff soon before this action was filed.

53.     Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment. Instead of disclosing the true facts, Defendants made false representations about the chances of winning on their websites tied to participants' skills.

54.     Defendants were under a continuous duty to disclose to Plaintiff and the other class members the facts that they knew about their websites, their players, and other inside information.

55.     Although they had the duty throughout the relevant period to disclose to Plaintiff and class members that they had engaged in the deception described in this Complaint, Defendants chose to knowingly use inside information, and they intentionally misrepresented players' chances of winning on their websites.  Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS DEFINITION

56.     The class is described as follows:

All persons who while residents of the state of Colorado participated in a real money DFS contest operated by FanDuel or DraftKings and paid an entry fee and did not exercise their right to a Money Back Guarantee.

57.     Excluded from the Class are:

a.      Officers, directors, agents, current or former employees, or representatives of Defendants;

b.      Defendants and any entities in which Defendants have a controlling interest;

c.      Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of the Defendants; and

d.      All persons or entities that properly execute and timely file a request for exclusion from the Class.

58.     Plaintiff reserves the right to modify or amend the definition of the class and to modify, amend or remove subclasses, before the Court determines the certification is appropriate and as the parties engage in discovery.

### CLASS ALLEGATIONS

59.     A class action is the proper forum to bring Plaintiff's claims under Fed.R.Civ.P. 23. The membership in the class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class which predominate over individual questions, the claims or defenses of the representative parties are typical of the claims or defenses of the classes, and the representative parties will fairly and adequately protect the interests of the classes.

60.     This action satisfies all the requirements of Federal Rule of Civil Procedure 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

61.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1).**  The membership of the class is so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  News accounts discuss how millions of users complete on websites of Defendants.

62.     **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**  The claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, but are not limited to:

a.      Whether Defendants made the representations set forth above, and substantially similar representations, to Plaintiff and the members of the class;

b.      Whether Defendants' advertisements were false, misleading and unfair:

c.      Whether Defendants owed duties to Plaintiff and the members of the class, and the scope of those duties, and if they breached those duties;

d.      Whether Defendants fraudulently induced Plaintiff and the members of the class into using their websites under false pretenses, through material misrepresentations or material omissions;

e.      Whether class members were harmed by Defendants' actions as described above;

f.      Whether the Terms of Use are against public policy, unconscionable, illusory, fraudulent or otherwise invalid;

g.      The extent of the damages caused by Defendants' acts;

h.      Whether Defendants' employees used non-public data and/or information to gain an advantage of DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to disclose to Plaintiff and the members of the class that these practices were occurring.

63.     **Typicality: Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other class member, was induced to use Defendants' sites based on false and misleading advertisements of fair play, the lack of

information about having to compete against players with inside information, and other misrepresentations.

64.     The claims of the Class Representative Plaintiff are furthermore typical of other class members because he makes the same claims as other class members. Plaintiff has the same interest in seeking compensation from Defendants.

65.     **Adequacy: Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the classes in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the classes. The interests of the class representative are consistent with those of the other members of the class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the class and the infringement of the rights and the damages he has suffered are typical of other class members.

66.     Plaintiff is represented by experienced and able counsel have expertise in the area of tort law, trial practice and class action representation. Plaintiff's counsel is experienced in prosecuting class actions and managing distributions to the class members.

67.     **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally acceptable to Plaintiff and members of the class, thereby making appropriate final injunctive and declaratory relief with respect to Plaintiff and class members.

68.     **Superiority: Federal Rule of Civil Procedure 23(b)(3).** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy

alleged herein; it will permit class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require.  Class action treatment will permit that adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants.  Further, even for those class members who could afford to litigate such a claim, it would be economically impractical.

69.     The nature of this action and the nature of applicable Colorado laws make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the members of the class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the members of the class and will establish the right of each member of the class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

## COUNT I - VIOLATIONS OF COLORADO CONSUMER PROTECTION ACT

70.     Plaintiff and the members of the class incorporate by reference all preceding allegations as though fully set forth herein.

71.     Plaintiff brings this claim individually and on behalf of the class.

72.     Plaintiff and the members of the class are actual consumers of the Defendants'

services and were injured as a result of Defendants' deceptive trade practices, pursuant to C.R.S. § 6-1-113(1)(a).

73.     Defendants' DFS constitute contests pursuant to C.R.S. § 6-1-802(1).

74.     Defendants are sponsors of a contest pursuant to C.R.S. § 6-1-802(9).

75.     The conduct of FanDuel and DraftKings, as described herein, was and is in violation of the Colorado Consumer Protection Act (CCPA), C.R.S. § 6-1-105.  Defendants' conduct violates the CCPA in at least the following ways:

a.     By engaging in deceptive trade practices by knowingly and intentionally concealing from Plaintiff, the members of the class, and the general public the fact that DFS is a game of chance, and not a game of skill;

b.     By engaging in deceptive trade practices by knowingly and intentionally concealing from Plaintiff and the members of the class the chance of success, and the factors within Defendants' control which determine success;

c.     By engaging in deceptive trade practices by knowingly and intentionally concealing from Plaintiff, the members of the class, and the general public the fact that their employees participated in their DFS contests, and did so with inside information that increased their chances of payment;

d.     By knowingly making false and/or misleading representations as to the legal status of DFS in the state of Colorado, pursuant to C.R.S. § 6-1-105(1)(e);

e.     By failing to disclose and knowingly and intentionally concealing from Plaintiff, the members of the class and the general public material

information concerning its services known at the time of advertisement and sale, with the intention to induce the class members to enter into a transaction pursuant to C.R.S. § 6-1-105(1)(u);

f.   By requiring Plaintiff and class members to pay Defendants money as a condition of allowing a person to receive, use, compete for, or obtain the prize or information about the prize pursuant to C.R.S. § 6-1-803(1);

g.   By failing to clearly and conspicuously disclose the estimated odds of receiving a prize pursuant to the requirements of the Act pursuant to C.R.S. § 6-1-803(5)(e);

h.   By representing that Plaintiff and the members of the class would and will have an increased chance of receiving a prize by making multiple or duplicate purchases or payments, and by entering the contest more than one time pursuant to C.R.S. § 6-1-180(9)(a);

I.   In the alternative, Defendants misrepresented the likelihood or odds of winning any prize pursuant to C.R.S. § 6-1-180(15)(a).

76.   Defendants' deceptive trade practices caused Plaintiff and the members of the class to deposit money into Defendants' accounts and compete in Defendants' DFS contests.

77.   Accordingly, Plaintiff and the members of the class have suffered injury in fact including lost money paid to Defendants as a result of Defendants' deceptive trade practices, and loss of the time value of that money.

78.   Plaintiff therefore requests that this Court enter such orders or judgments as may be

18

necessary to restore to Plaintiff and the members of the class any money Defendants acquired by their deceptive trade practices, including restitution and/or restitutionary disgorgement, treble damages, and for such other relief allowable under the Act.

## COUNT II - NEGLIGENCE

79.     Plaintiff and members of the class repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

80.     Plaintiff brings this claim individually and on behalf of the class.

81.     Defendants DraftKings and FanDuel owed duties to Plaintiff and the members of the class as users and paying customers of their sites to use reasonable care to provide true, reliable and legal information and contests.

82.     DraftKings and FanDuel breached their duties to Plaintiff and the members of the class by failing to provide accurate and honest information about the nature and status of Defendants' DFS operations, the risk involved in playing, the likelihood of return and other factors material to the risk associated with their contests.

83.     DraftKings and FanDuel breached their duties to Plaintiff and the members of the class by failing to prevent persons with inside information and data by virtue of their employment at DFS sites from competing against Plaintiff and the members of the class.

84.     In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied false information to Plaintiff and the members of the class.

85.     Plaintiff and the members of the class justifiably relied upon the information supplied

by Defendants, and, as a result, deposited money with Defendants and lost money.

86.     Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data, and the ability of employees to use material, non-public data to compete against Plaintiff and the class members on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiff and the members of the proposed class competed.

87.     As a direct and proximate result of Defendants' negligence, Plaintiff and the members of the class were damaged in an amount to be proven at trial.

## COUNT III - DECEIT BASED ON FRAUD - NONDISCLOSURE OR CONCEALMENT

88.     Plaintiff and the members of the class repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

89.     Plaintiff brings this claim individually and on behalf of the class.

90.     Defendants knowingly and intentionally concealed facts and failed to disclose material facts about which Defendants had exclusive knowledge and knew the facts were unknown to or reasonably discoverable by Plaintiff or class members, and that by failing to disclose these facts, Plaintiff and the members of the class were induced to act upon the facts as they understood them, rather than the true facts that were concealed from them by Defendants.

91.     Specifically, and as detailed above, Defendants represented that their contests were fair games of skill.  Defendants willfully and intentionally failed to disclose that their contests were games of chance with many factors outside Plaintiff's and class members' control and that employees, agents, owners, and/or others with non-public information, data, and access to Plaintiff's and the

class's submissions would use this information to compete against Plaintiff and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff's and the members of the class's ability to use skill to win.

92.     Plaintiff and the members of the class justifiably relied on these material omissions of Defendants, which caused them injuries, damages and losses.

93.     Plaintiff and the members of the class would not have deposited money or participated in contests on Defendants' websites if they had known that they constituted illegal gambling in the state of Colorado and were not contests of skill but contests of chance.

94.     Plaintiff and the members of the class would not have deposited money or participated in contests on Defendants' websites if they had known that they were competing against individuals with insider knowledge and use of non-public data.

95.     Defendants were aware that the integrity of the games was a material fact in inducing Plaintiff and the members of the class to give them money in exchange for services and agreeing to alleged contract.

96.     As a result of Defendants' fraudulent omissions and concealment, Plaintiff and the members of the class were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

## COUNT IV - DECEIT BASED ON FRAUD - FALSE REPRESENTATION

97.     Plaintiff and the members of the class repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

98.     Plaintiff brings this claim individually and on behalf of the class.

21

99.     Defendants intentionally made material representations that were false, that Defendants knew were false or reckless as to the veracity and made with inducement for Plaintiff and the members of the class to act upon.

100.    Specifically, and as detailed above, Defendants represented that their contests were fair games of skill.  Defendants falsely represented that increasing the number of plays increased the chances of winning.  Defendants also willfully failed to disclose that employees, agents, owners, and/or others with non-public information, data, and access to the submissions of Plaintiff and the class would use this information to compete against Plaintiff and obtain an increased chance to win, thereby greatly decreasing Plaintiff's and the members of the class's ability to use skill to win.

101.    Plaintiff and the members of the class justifiably relied on these false, material representations made by Defendants, which caused them injuries, damages and losses.

102.    Plaintiff and the members of the class would not have deposited money or participated in contests on Defendants' websites if they had known that they constituted illegal gambling in the state of Colorado and were not contests of skill but contests of chance.

103.    Plaintiff and the members of the class would not have deposited money or participated in contests on Defendants' websites if they had known that they were competing against individuals with insider knowledge and use of non-public data.

104.    Defendants were aware that the integrity of the games was a material fact in inducing Plaintiff and the members of the class to give them money in exchange for services and agreeing to alleged contract.

105.    As a result of Defendants' fraudulent representations, Plaintiff and the members of

22

the class were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

## COUNT V - CIVIL CONSPIRACY

106.    Plaintiff and the members of the class repeat, reallege, and incorporate by reference each of the foregoing allegation as though fully set forth herein.

107.    Plaintiff brings this claim individually and on behalf of the class.

108.    As detailed above, Defendants engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

109.    Specifically, by affirmatively agreeing to allow Defendants' employees to play on their own sites against their own players and concealing and not disclosing this to Plaintiff and the members of the class, Defendants committed fraud and other intentional wrongful acts.  Defendants' unlawful acts were performed to accomplish this fraud and wrongdoing.

110.    As a result of Defendants' actions in carrying out their fraudulent scheme, Plaintiff and members of the class suffered injuries, damages and losses in an amount to be proven at trial.

## COUNT VI - VIOLATION OF THE COLORADO ORGANIZED CRIME CONTROL ACT, C.R.S. §§ 18-17-101, *ET SEQ.*

111.    Plaintiff and the members of the class repeat, reallege, and incorporate by reference each of the foregoing allegation as though fully set forth herein.

112.    Plaintiff brings this claim individually and on behalf of the class.

113.    Defendants engaged in racketeering activity as defined by the Colorado Organized

23

Crime Control Act, C.R.S. §§ 18-17-101, *et seq.* ("COCCA") when they committed, conspired to commit, and solicited others to engage in illegal gambling under C.R.S. §§ 18-10-102(2) and -103(2).

114.   Defendants knowingly and unlawfully received proceeds derived directly and indirectly from a pattern of racketeering activity – that is, on at least two occasions they engaged in illegal activity by allowing competitors' employees to play on their own sites against their own players knowing their competitors' employees had inside information that was not otherwise known or available to the public, Plaintiff, and members of the class. Plaintiff and the members of the class were at a distinct disadvantage and suffered damages and losses as a result of Defendants' illegal conduct.

115.   Defendants are liable to Plaintiff and members of the class for treble damages, costs and attorney fees, and any other damages as allowable by law.

## COUNT VII - UNJUST ENRICHMENT

116.   Plaintiff and the members of the class repeat, reallege, and incorporate by reference each of the foregoing allegation as though fully set forth herein.

117.   Plaintiff brings this claim individually and on behalf of the class.

118.   Plaintiff and the members of the class conferred a benefit on Defendants by depositing money and participating in contests on their websites.

119.   Defendants have been unjustly enriched in retaining the revenues derived from the contest entries of Plaintiff and the members of the class, and the profits made on those revenues, which retention under these circumstances is unjust and inequitable because Defendants

misrepresented the facts concerning skill and the fair play available on their websites.

120.    Plaintiff and the members of the class were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts.

121.    Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the class is unjust and inequitable, Defendants must disgorge this unjust enrichment, including not only the fees paid but the monies made based on the fees.  Defendants must pay restitution to Plaintiff and the members of the class for their unjust enrichment, as ordered by the Court.

## COUNT VIII - NEGLIGENCE *PER SE*

122.    Plaintiff and the members of the class repeat, reallege, and incorporate by reference each of the foregoing allegation as though fully set forth herein.

123.    Plaintiff brings this claim individually and on behalf of the class.

124.    At the time Plaintiff and class members participated on FanDuel's and DraftKings' websites, the Colorado Consumer Protection Act (CCPA), C.R.S. § 6-1-105 was in effect.

125.    At the time Plaintiff and class members participated on FanDuel's and DraftKings' websites, the Colorado Organized Crime Control Act, C.R.S. §§ 18-17-101, *et seq.* ("COCCA") was in effect.

126.    Defendants are liable to Plaintiff and the class members for negligence *per se*.

127.    Accordingly, Plaintiff and the other class members have suffered injury in fact

including lost money as a result of their participation in FanDuel's and DraftKings' contests. Defendants' deceptive trade practices, as described herein, have caused actual damages and losses to Plaintiff and the class in an amount to be proven at trial.

128.    Plaintiff therefore requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and members of the class any money Defendants acquired by deceptive trade practices, including restitution and/or restitutionary disgorgement, treble damages, and for such other relief allowable under the CCPA and COCCA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the members of the class pray for relief and judgment against Defendants, as follows:

a.    For an order certifying the Class, appointing Plaintiff and his counsel to represent the Class, and giving notice to the Class to be paid by Defendants;

b.    For damages suffered by Plaintiff and the members of the class;

c.    For restitution to Plaintiff and the members of the class of all monies wrongfully obtained by Defendants;

d.    For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.    For an order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

26

f.      For punitive or exemplary damages;

g.      For reasonable attorney fees, as permitted by law;

h.      For costs incurred as permitted by law;

I.      For pre-judgment and post-judgment interest at the maximum allowable rate

on any money awarded; and

j .     For such other and further relief that this Court deems just and proper under

equity and law.

### **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial pursuant to Fed.R.Civ.P. 38.

DATED this 26th day of October, 2015.

By: s/ Kevin S. Hannon_____
***Kevin S. Hannon***
The Hannon Law Firm, L.L.C.
1641 Downing Street
Denver, Colorado 80218
Tel: (303) 861-8800
FAX: (303) 861-8855
Email: khannon@hannonlaw.com

By: s/ Gillian M. Fahlsing_____
***Gillian M. Fahlsing***
The Hannon Law Firm, L.L.C.
1641 Downing Street
Denver, Colorado 80218
Tel: (303) 861-8800
FAX: (303) 861-8855
Email: gfahlsing@hannonlaw.com
*Attorneys for Plaintiff*

Plaintiff's Address:
P.O. Box 16607
Denver, CO 80216